1 **WO**

2

3

4

5

6 **IN THE UNITED STATES DISTRICT COURT**

7 **FOR THE DISTRICT OF ARIZONA**

8

9 Jeremy J. Williams,                              No. CV-24-00924-PHX-JAT (JFM)

10              Plaintiff,                          **ORDER**

11 v.

12 N. Otter, et al.,

13              Defendants.

14

15          Self-represented Plaintiff Jeremy J. Williams brought this civil rights action under

16 42 U.S.C. § 1983 against correctional officers Velasco, Otter, and Fitzgibbon. Defendants

17 move for summary judgment on the merits of Plaintiff's Eighth Amendment excessive

18 force claim, and on qualified immunity grounds. (Doc. 82). The Court now rules.

19    **I.      BACKGROUND**

20          Plaintiff's claims arose on August 14, 2023, while he was housed in protective

21 custody in the Special Management Unit-1 ("SMU-1") at the Arizona State Prison

22 Complex-Eyman ("ASPC-Eyman"). (Doc. 1 at 7). Plaintiff alleges that Defendant Velasco

23 "randomly" fired non-lethal projectiles at Plaintiff, that Defendant Otter body slammed

24 Plaintiff while he was restrained, and that Defendant Fitzgibbon twisted Plaintiff's wrist,

25 overly tightened Plaintiff's restraints for the purpose of causing Plaintiff pain, and punched

26 Plaintiff while he was restrained. (*Id.* at 8, 10–11). Plaintiff asserts excessive force claims

27 against Defendants Velasco, Otter, and Fitzgibbon. (*Id.* at 7–12).

28          Defendants move for summary judgment on the grounds that: (1) Defendant

1   Velasco did not violate the Eighth Amendment when he fired non-lethal projectiles at
2   Plaintiff, (2) Defendant Otter did not violate the Eighth Amendment when he body
3   slammed Plaintiff, (3) Defendant Fitzgibbon's use of restraints did not violate the Eighth
4   Amendment, and (4) Defendants are entitled to qualified immunity. (Doc. 82).

5   **II.    SUMMARY JUDGMENT STANDARD**

6       "Summary judgment is appropriate only if, taking the evidence and all reasonable
7   inferences drawn therefrom in the light most favorable to the non-moving party, there are
8   no genuine issues of material fact and the moving party is entitled to judgment as a matter
9   of law." *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011); Fed. R. Civ. P.
10  56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable
11  jury could return a verdict for the nonmoving party.'" *Sierra Med. Servs. All. V. Kent*, 883
12  F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
13  248 (1986)). The moving party bears the initial burden of presenting the basis for its motion
14  and identifying those portions of the record that it believes demonstrate the absence of a
15  genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Once
16  the moving party meets its burden of establishing the absence of a genuine issue of material
17  fact, the nonmoving party must go beyond the pleadings and identify facts which show a
18  genuine issue for trial." *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223,
19  1229 (9th Cir. 2000); *see* Fed. R. Civ. P. 56(c)(1). At summary judgment, the judge's
20  function is not to weigh the evidence and determine the truth but to determine whether
21  there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court need only consider
22  the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P.
23  56(c)(3).

24  **III.   FACTS**

25      As stated, where the parties' versions of events differ, the Court takes Plaintiff's
26  facts as true. *See Anderson*, 477 U.S. at 255. In this case, there is also video footage of
27  some portions of the incidents giving rise to Plaintiff's excessive force claims. (*See* Doc.
28  83-2, Ex. 10; Doc. 83-4, Ex. 12). The Court considers the facts in the light depicted by the

videos but still draws all inferences from the videos in Plaintiff's favor. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (noting that a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. L.V. Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("The existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor.").

On the date of the incident, Plaintiff was a prisoner housed at ASPC-Eyman SMU-1. (Docs. 83, 95 ¶ 1). While Plaintiff was in the recreational yard, an Incident Command System ("ICS") was called because an inmate-on-inmate fight broke out in the yard. (*Id.* ¶ 13; Doc. 1 at 8 ¶ 5; Doc. 83-2, Ex. 10, 14:20:56). One of the inmates had a weapon, and one was severely bleeding. (Docs. 83, 95 at ¶¶ 14, 32; Doc. 83-2, Ex. 10, 14:20:59–14:21:02, 14:21:30). Plaintiff was not involved in the fight. (Docs. 83, 95 ¶ 13). When the fight broke out, Plaintiff was walking to get more water and was not near the fight. (*Id.* ¶¶ 12, 15; Doc. 83-2, Ex. 10, 14:20:56–14:21:11). While the fight was still ongoing, Plaintiff walked away from the water area and headed towards the center of the yard in the general direction of where the fight was taking place. (Doc. 83-2, Ex. 10, 14:21:28–38). Plaintiff claims he was not walking towards the fight and did not know the fight was occurring. (Doc. 95 ¶¶ 27–28; Doc. 83-1 at 35; Doc. 94, Ex. 3A). While Plaintiff approached the center of the yard still some distance from the fight, he turned and began walking towards the pull-up bar at the back of the yard. (Doc. 83-2, Ex. 10, at 14:21:38). The fight ended a few seconds later and the inmates involved dispersed and eventually got on their knees. (*Id.* at 14:21:40–48).

At that time, Plaintiff turned around and began walking quickly towards the front of the yard. (*Id.* at 14:21:48–52; Docs. 83, 95 ¶ 16, 19, 29). Plaintiff claims that he turned around because he heard shooting and was walking to "cuff up" because he heard officers giving commands but could not tell what they were saying. (Docs. 83, 95 ¶¶ 16, 19; Doc. 83-1 at 36, 38; Doc. 95 ¶ 34). Defendant Velasco stated in his incident report that he gave

Plaintiff "several loud directives to get down on the ground and [Plaintiff] refused to comply." (Doc. 83 ¶ 35; Doc. 83-3 at 9). However, Plaintiff alleges that because he was not involved in the fight and did not hear a "disturbance siren" as he was accustomed to, Plaintiff did not think the officers were directing their commands at him. (Doc. 95 ¶¶ 34–35; Doc. 83-1 at 38–39). Plaintiff claims he was then hit in the stomach, chest, and leg with pepper balls[1] fired by Defendant Velasco. (Docs. 83, 95 ¶¶ 21, 31, 33; Doc. 83-2, Ex. 10, at 14:21:53–58). Plaintiff further alleges he was hit even after laying on the ground. (Docs. 83, 95 ¶ 38; Doc. 1 at 8 ¶ 7).[2]

About an hour after the incident in the recreational yard, two officers escorted Plaintiff back to his cell. (Doc. 1 at 10–11; Doc. 94 at 3; Doc. 83-4, Ex. 12, 15:32:28). Plaintiff's hands were in restraints behind his back. (Doc. 83-4, Ex. 12, 15:32:30). Plaintiff is seen shrugging his shoulders three to four times. (*Id.* at 15:32:28–31; Docs. 83, 95 ¶¶ 42, 44). Plaintiff claims that he was asking to be decontaminated before going into the cell because the powder from the pepper balls got in his eyes.[3] (Docs. 83, 95 ¶ 42; Doc. 83-1 at 53). Defendant Otter then body slammed Plaintiff by pushing on Plaintiff's left shoulder and neck area while simultaneously sweeping Plaintiff's feet off the ground. (Doc. 83-4, Ex. 12, 15:32:31–32; Docs. 83, 95 ¶¶ 41, 48–49; Doc. 83-3 at 8, 10).

---

[1] A "pepper ball" is "a projectile that, upon impact, releases a chemical irritant similar to pepper spray." *Martinez v. Smith*, No. CV-15-00117-TUC-JGZ, 2017 WL 1210595, at *4 n.8 (D. Ariz. Mar. 31, 2017); *see also Nelson v. City of Davis*, 685 F.3d 867, 873 (9th Cir. 2012) ("Pepperball guns are, in essence, paintball guns that fire rounds containing oleoresin capsicum ("OC") powder, also known as pepper spray. . . . They break open on impact and release OC powder into the air, which has an effect similar to mace or pepper spray.").

[2] Defendants dispute this, arguing that the incident reports do not indicate Plaintiff was shot after laying on the ground and that there is no video footage of further shots. (Doc. 83 at ¶ 39).

[3] The video footage has no audio. Defendants claim that Plaintiff refused to go in the cell and was threatening to head butt the officers. (Doc. 83 ¶¶ 46–47, 50).

- 4 -

Immediately after Defendant Otter brought Plaintiff to the ground, an ICS was called and several officers assisted in securing Plaintiff in a restraint chair. (Docs. 83, 95 ¶ 54; Doc. 1 at 10; Doc. 83-4, Ex. 12). Plaintiff alleges that before placing him in the restraint chair, Defendant Fitzgibbon twisted Plaintiff's wrist while yelling obscenities at Plaintiff. (Docs. 83, 95 ¶ 55; Doc. 1 at 11 ¶ 20; Doc. 83-1 at 48). Once in the restraint chair, Plaintiff claims he complained of pain in his left shoulder and arm. (Docs. 83, 95 ¶ 55; Doc. 1 at 11 ¶ 20; Doc. 83-1 at 48). Plaintiff claims Defendant Fitzgibbon responded by saying, "Oh yeah? You don't have shit coming. Want to do this shit on camera?" and then forcefully yanked on the left shoulder restraint to tighten it. (Docs. 83, 95 ¶ 56; Doc. 83-1 at 49; Doc. 1 at 10–11; Doc. 83-4, Ex. 12, 15:37:16).

Plaintiff further alleges that Defendant Fitzgibbon and another officer escorted him to the medical unit and then to "an outside holding enclosure," where Defendant Fitzgibbon allegedly threw Plaintiff's "face to the ground striking him in the face" and yelling at him not to move. (Doc. 1 at 7, 11; see Doc. 83-3 at 11–12). Plaintiff claims that he was in restraints and could not defend himself from Defendant Fitzgibbon's punches. (Doc. 1 at 11).

Plaintiff initially declined medical treatment but claims he did so because he was disoriented from the incidents and was scared the officers would retaliate against him. (Docs. 83, 95 ¶ 40; Doc. 1 at 11 ¶ 21). Two days later, on August 16, 2023, Plaintiff was seen by a telehealth provider for complaints of left shoulder pain from the injuries sustained on August 14, 2023. (Doc. 83-1 at 65, 76). On November 17, 2023, Plaintiff had an MRI that showed a small partial tear in his left shoulder and at the base of his neck. (Docs. 83, 95 ¶ 9; Doc. 83-1 at 71, 77). Plaintiff claims that his shoulder pain is an ongoing issue. (Doc. 83-1 at 53). Plaintiff was seen by medical providers numerous times in the following years for complaints of left shoulder pain. (*Id.* at 67, 76–79).

## IV.    EXCESSIVE FORCE CLAIMS

Claims of excessive force against a prisoner are analyzed under the Eighth Amendment, which guarantees prisoners the right to be free from "cruel unusual

- 5 -

punishments." *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Whitley v. Albers*, 475 U.S. 312, 318–19 (1986). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. As the Supreme Court has emphasized, "*de minimis* uses of physical force" do not offend the Constitution so long as the use of force is not "repugnant to the conscience of mankind." *Id.* at 9–10 (quoting *Whitley*, 475 U.S. at 327). In analyzing excessive force claims brought under the Eighth Amendment, the central inquiry is "whether the particular use of force amounts to the 'unnecessary and wanton infliction of pain.'" *Graham*, 490 U.S. at 398 & n.11.

However, the Court must keep in mind that prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). "In the specialized context of prison operations, the use of force can be a 'legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel.'" *Simmons v. G. Arnett*, 47 F.4th 927, 933 (9th Cir. 2022) (quoting *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979)). The Supreme Court clarified in *Whitley* that "[t]he infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. Where "a prison security measure is undertaken to resolve a disturbance" that "indisputably poses significant risks to the safety of inmates and prison staff," the inquiry "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted); *Hudson v. McMillan*, 503 U.S. 1, 6 (1992). "Put simply, officer intent . . . serves as the core dividing factor between constitutional and unconstitutional applications of force." *Hoard v. Hartman*, 904 F.3d 780, 788 (9th Cir. 2018).

The Supreme Court has articulated five factors to be considered in determining whether a defendant's use of force was a good faith effort to restore discipline or malicious and sadistic for the purpose of causing harm: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Furnace v. Sullivan*, 705 F.3d 1021, 1029 (9th Cir. 2013); *Whitley*, 475 U.S. at 321; *Hudson*, 503 U.S. at 7.

**A. Defendant Velasco**

1. Pepper ball shots fired at Plaintiff.

First, the Court considers the extent of Plaintiff's injury. The parties do not dispute that Plaintiff was hit with at least one pepper ball round fired by Defendant Velasco,[4] which is more than a de minimis use of force. (Docs. 83, 95 ¶¶ 21, 31, 33; *see* Doc. 83-3 at 9); *see Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (noting that "a push or shove that causes no discernible injury" is a de minimis use of force that "almost certainly fails to state a valid excessive force claim"); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) ("[P]epper spray is an instrument with which prison officers wield their authority, or force, and thus its use implicates the excessive use of force.").

Defendants argue that the first factor weighs in their favor because Plaintiff's injuries were temporary and minor. (Doc. 82 at 7–8). Plaintiff does not dispute that his physical injuries were temporary. Plaintiff stated that he suffered temporary shortness of breath, chest pains from the impact of the pepper balls that lasted about one minute, welts and bruises that lasted about one week, blindness from the pepper ball powder that lasted a few hours, and temporary disorientation. (Doc. 83-1 at 52–53). Because Plaintiff admits that the pain and discomfort from the impact of the shots was temporary and did not result in lasting complications, this factor weighs slightly in favor of Defendants. *See Hughes v.*

---

[4] Defendants request that the Court dismiss Defendant Otter on the excessive force claim regarding the pepper ball shots. (Doc. 82 at 4 n.1). Plaintiff admits Defendant Velasco shot the pepper ball rounds at him, not Defendant Otter. (Doc. 83, 95 ¶¶ 12, 26, 33; Doc. 83-1 at 41). Accordingly, the Court will grant summary judgment in favor of Defendant Otter on the excessive force claim regarding the pepper ball shots.

*Rodriguez*, 31 F.4th 1211, 1221 (9th Cir. 2022) (concluding that a dog bite, abrasions, and bruising that left "scarring and residual soreness" but no other lasting complications were "relatively minor" injuries that weighed slightly in favor of the officers).

Second, the Court considers the need for force. Defendants argue that force was necessary to restore order during a prison disturbance. (Doc. 82 at 8–9). Defendants first argue that force was necessary because officers were responding to an inmate-on-inmate assault involving a weapon where one of the inmates was severely bleeding, and that it was reasonable for Defendant Velasco to assume Plaintiff was part of the fight. (Doc. 82 at 8–9). Plaintiff argues that it was apparent he was not directly involved the fight because he was not near the fight, and that Defendants could not have reasonably thought that Plaintiff was involved in the fight. (Doc. 94 at 2; Doc. 94, Ex. 3A, at 31; Doc. 83-2, Ex. 10; Doc. 83-3 at 9). When viewed in the light most favorable to Plaintiff, the evidence supports that the officers knew Plaintiff was not involved in the fight. The video footage shows the three inmates involved in the fight either on their knees or laying with their chests on the ground, but after Plaintiff was shot, he was seemingly allowed to walk away from the officers back to where the other non-involved inmates were playing basketball. (Doc. 83-2, Ex. 10, at 14:21:57–14:22:03). Additionally, the officers' statements in their incident reports discuss Plaintiff separately from the inmates involved in the fight. (Doc. 83-3 at 5, 9–10). The inference from this evidence—which must be drawn in Plaintiff's favor—is that Defendant Velasco knew Plaintiff was not involved in the fight when he shot at Plaintiff.

Defendants additionally argue that even if Plaintiff was not directly involved in the fight, force was necessary to gain compliance and prevent further injury because Plaintiff refused to comply with officer commands during a highly volatile and dangerous event. (Doc. 82 at 8–9); *see Spain*, 600 F.2d at 195 (noting that force may be necessary if a prisoner refuses to comply with a command). Defendant Velasco stated in his incident report that Plaintiff "started advancing towards [his] direction in an aggressive manner, clenching his fists," and he gave Plaintiff "several loud directives to get down on the ground and [Plaintiff] refused to comply." (Doc. 83 ¶¶ 34–35; Doc. 83-3 at 9). Plaintiff admits that

he heard the officers "giving demands," but stated that he could not tell what they were saying and did not hear any commands directed at him. (Doc. 83-1 at 38). Thus, a triable issue of fact exists as to whether officers gave Plaintiff commands, and if so, what those commands were. A reasonable jury could find that no clear orders were given, and thus that officers could not justify their use of force on the basis that Plaintiff was defying orders. *See Furnace*, 705 F.3d at 1029 ("Officers cannot justify force as necessary for gaining inmate compliance when inmates have been given no order with which to comply."). Moreover, Defendants have not alleged that Plaintiff's actions interfered with the officers' response to the prison disturbance. Therefore, a triable issue of fact exists as to whether force was needed. Viewing the facts in the light most favorable to Plaintiff, this factor tips slightly in Plaintiff's favor.

Third, the Court considers the relationship between the need for force and force used. Prison officials may use force only in proportion to the need in each situation. *See Spain*, 600 F.2d at 195 ("The infliction of pain and the danger of serious harm may be necessary if there is a threat of an equal or greater harm to others, as is reflected in the doctrine of self defense . . . . Inherent in the doctrine of self defense is the concept of proportion."). Defendants argue that shooting Plaintiff with pepper balls was proportionate to the threat because Plaintiff was ignoring officer instructions, no officers were inside the fenced yard, and officers had to act quickly to prevent further harm. (Doc. 82 at 9).

However, there are genuine issues of material fact as to the number of times Plaintiff was shot, whether Plaintiff defied orders, and whether Plaintiff posed a threat to the officers' response to the fight. The video supports Plaintiff's assertion that he was shot more than once, although it is not clear from the video how many times Plaintiff was hit. (Doc. 83-2, Ex. 10, at 14:21:53–56; *see* Doc. 1 at 9; Doc. 85 ¶ 21).

Additionally, a reasonable jury could find that the officers did not order Plaintiff to get on the ground. The video shows that after Plaintiff was shot, he did not get on the ground but instead turned away from the officers and walked to where the other non-involved inmates were playing basketball. (Doc. 83-2, Ex. 10, at 14:21:57–14:22:03).

Because Plaintiff was seemingly not required to get on the ground and was permitted to walk away without getting further shot at, a reasonable jury could infer that the officers did not order Plaintiff to get on the ground, and thus that Plaintiff was not defying orders.

Moreover, a reasonable jury could find that there was no longer a need for force once Plaintiff stopped walking and the involved inmates were on the ground. The video shows that the three inmates involved in the altercation had dispersed and were no longer fighting when Plaintiff turned around and began walking towards the officers. (Doc. 83-2, Ex. 10, at 14:21:49). It appears from the video that Plaintiff was shot for the first time as he was still walking towards the officers, but that Plaintiff stopped walking and was just standing in the middle of the yard for several seconds before he was shot one to two more times in the chest. (*Id.* at 14:21:54–57). The video also shows that these additional shots occurred after the involved inmates were already on their knees. (*Id.* at 14:21:55–56).

Construing the facts in Plaintiff's favor, it is not clear that the force used was necessary or proportionate to the harm. Even if firing a pepper ball round at Plaintiff was necessary when Plaintiff was walking towards the officers, a reasonable jury could find that the additional shots fired after Plaintiff stopped walking and when the involved inmates were on the ground were not necessary to gain Plaintiff's compliance and prevent further harm. This factor weighs in favor of Plaintiff.

Fourth, the Court considers "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them." *Whitley*, 475 U.S. at 321. Defendants argue that Plaintiff was "charging towards the officers with his fists clenched" and "was ignoring instructions during a highly volatile event." (Doc. 82 at 9). Plaintiff argues he did not pose a threat to the other inmates because it was obvious he was not involved in the fight and did not have a weapon, he was not near the fight, and he did not attempt to go near the fight. (Doc. 94 at 2). Plaintiff also argues he did not pose a threat to officers even if he was "charging" towards them with clenched fists because he was far away from the officers and was in an enclosed yard with a fence between him and the officers. (*Id.*).

As previously discussed, when Plaintiff was shot one to two additional times in the chest, Plaintiff had already stopped walking towards the officers, the inmates involved in the fight were already on the ground, and it is unclear what orders, if any, were given to Plaintiff. While it was reasonable for Defendant Velasco to perceive a threat when Plaintiff was charging towards the officers, a jury could find that Plaintiff posed no reasonable threat once he stopped walking and the involved inmates were on the ground. This factor weighs in Plaintiff's favor.

Finally, the Court considers whether any efforts were made to temper the severity of a forceful response. Defendants argue that they tempered their use of force by giving Plaintiff multiple warnings before he was shot. (Doc. 82 at 9). Plaintiff disputes that the officers gave him clear orders. (Doc. 95 ¶¶ 34–35; Doc. 83-1 at 38). Viewing the facts in Plaintiff's favor, a reasonable jury could find that the officers did not give Plaintiff clear warnings prior to using force. Moreover, Plaintiff alleges that officers did not allow him to decontaminate. *See Furnace*, 705 F.3d at 1030 (noting that officers made an effort to temper the severity of their use of pepper spray "by allowing [the inmate] to decontaminate, and giving him medical treatment"). Consequently, this final factor tips in Plaintiff's favor.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendant Velasco used excessive force when he shot Plaintiff with pepper balls. Therefore, the Court will deny summary judgment on the excessive force claim against Defendant Velasco.

### 2. Shots fired after Plaintiff was laying on the ground.

Plaintiff stated in his verified complaint that even after laying on the ground, he was shot at approximately twenty times. (Doc. 1 at 8 ¶ 7). Defendants argue that neither the incident reports nor video footage indicate that Plaintiff was shot at after laying on the ground. (Doc. 83 ¶ 39). However, Plaintiff's statements to the contrary in his verified complaint and in his summary judgment briefing are based on Plaintiff's personal knowledge and therefore create a genuine issue of material fact as to whether Plaintiff was shot even after laying on the ground. (Docs 83, 95 ¶¶ 38–39); *see T.W. Elec. Serv., Inc. v.*

1    *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987) ("If the nonmoving party

2    produces direct evidence of a material fact, the court may not assess the credibility of this

3    evidence nor weigh against it any conflicting evidence presented by the moving party. The

4    nonmoving party's evidence must be taken as true."); *McLauglin v. Liu*, 849 F.2d 1205,

5    1208 (9th Cir. 1988) (concluding that a nonmoving party's sworn statements on a central

6    fact in dispute is direct evidence that precludes summary judgment); *Schroeder v.*

7    *McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) ("A verified complaint may be used as an

8    opposing affidavit under Rule 56" if it is "based on personal knowledge and set forth

9    specific facts admissible in evidence."); Fed. R. Civ. P. 56(c).

10          Defendants did not provide any evidence contradicting Plaintiff's account of what

11   took place. Defendants' statement that no video footage supports Plaintiff's claims does

12   not demonstrate an absence of a genuine issue of material fact. Defendants did not provide

13   video footage conclusively showing that Plaintiff was not shot once on the ground. The

14   video footage provided by Defendants ends before Plaintiff is shown laying on the ground

15   (Doc. 83-2, Ex. 10), and Defendants do not explain why the video footage did not capture

16   Plaintiff laying on the ground. Moreover, Plaintiff presented evidence that the incident

17   reports are not reliable. (*See* Doc. 95 ¶ 39; Doc. 94 at 35–38). A reasonable jury could find

18   based on Plaintiff's testimony that Plaintiff was shot at even after he was laying on the

19   ground.

20          While Plaintiff has personal knowledge of being shot at, Plaintiff lacks personal

21   knowledge as to who fired the shots because Plaintiff admitted he is unsure which officers

22   shot at him once he was on the ground. (Doc. 95 ¶ 38); *see Columbia Pictures Indus., Inc.*

23   *v. Prof. Real Estate Investors, Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991) (noting that

24   statements "not based on personal knowledge, but on information and belief," are

25   insufficient to raise a triable issue of fact). However, the incident reports indicate that

26   Defendants Velasco and Otter were the only officers who deployed weapons. (Doc. 83-3

27   at 5). Defendant Velasco stated in the incident report that he "deployed approximately (15)

28   pepper-ball rounds from the pepper-ball launcher" prior to deploying a pepper ball round

at Plaintiff, and Defendant Otter stated in the incident report that he only deployed two super sock rounds from the 12 gauge shotgun. (*Id.* at 9–10). As previously mentioned, Plaintiff presented evidence that the incident reports are not reliable. (Doc. 95 ¶ 39). Taking as true Plaintiff's allegation that he was shot after laying on the ground and viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant Velasco's statement in the incident report that he deployed approximately fifteen pepper ball rounds is consistent with Plaintiff's allegation that he was shot at approximately twenty times, and that the incident report inaccurately stated that those shots were deployed before Plaintiff was on the ground.

The resolution of this factual dispute depends on credibility determinations that can only be decided by a jury. *Anderson*, 477 U.S. at 255 ("Credibility determinations . . . are jury functions."). Therefore, the Court will deny summary judgment on the excessive force claim against Defendant Velasco related to the shots allegedly fired at Plaintiff after he was laying on the ground.

**B. Defendant Otter**

First, the Court considers the extent of Plaintiff's injury. Plaintiff claims that his left shoulder was injured when Defendant Otter body slammed him by grabbing his left shoulder. (Doc. 1 at 7). Plaintiff had an MRI that showed a small partial tear in his left shoulder and at the base of his neck. (Docs. 83, 95 ¶ 9; Doc. 83-1 at 71, 77). Plaintiff claims that his shoulder pain is an ongoing issue that has lasted years. (Doc. 83-1 at 53). This factor weighs in favor of Plaintiff.

Next, the Court considers the need for force, proportionality, and reasonable threat perceived. The video footage does not clearly support that Plaintiff shoulder checked Defendant Otter or otherwise instigated aggression. Without audio, the video footage also does not clearly indicate whether Plaintiff was resisting or making threats. Defendants argue that Plaintiff was threatening to head butt the officers, while Plaintiff argues that he was simply asking to be decontaminated. Taking as true Plaintiff's version of the facts that he was simply asking to be decontaminated and did not threaten or physically resist the

officers, a reasonable jury could find that Defendant Otter used excessive force when he body slammed Plaintiff in response to Plaintiff asking to be decontaminated.

The Court finds there are factual disputes whose resolution depends on credibility determinations that can only be decided by a jury. *Anderson*, 477 U.S. at 255 ("Credibility determinations . . . are jury functions."). Because the Court cannot make such credibility determinations at the summary judgment stage, it will deny summary judgment on the excessive force claim against Defendant Otter related to the body slamming incident.

### C. Defendant Fitzgibbon

#### 1. Restraint Chair

First, the Court considers the extent of Plaintiff's injury. Plaintiff claims that his left shoulder was further injured when Defendant Fitzgibbon yanked the left shoulder strap of the restraint chair. (Doc. 1 at 7). Plaintiff had an MRI that showed a small partial tear in his left shoulder and at the base of his neck. (Docs. 83, 95 ¶ 9; Doc. 83-1 at 71, 77). Plaintiff claims that his shoulder pain is an ongoing issue that has lasted years. (Doc. 83-1 at 53). This factor weighs in favor of Plaintiff.

Next, the Court considers the need for force, proportionality, and reasonable threat perceived. Plaintiff claims that he specifically complained to Defendant Fitzgibbon that he was experiencing pain in his left shoulder and arm. (Doc. 83-4, Ex. 12, at 15:36:55; Doc. 83-1 at 48). The video footage then shows Defendant Fitzgibbon yanking on Plaintiff's left shoulder strap. (Doc. 83-4, Ex. 12, at 15:37:16). Plaintiff alleges that Defendant Fitzgibbon was taunting him with threatening remarks as he tightened Plaintiff's shoulder strap. (Docs. 83, 95 ¶ 56; Doc. 83-1 at 49; Doc. 1 at 10–11). The video shows that the other officer did not tighten Plaintiff's right shoulder strap in the same forceful manner as Defendant Fitzgibbon. (Doc. 93-4, Ex. 12, at 15:37:17–22). Plaintiff also alleges that Defendant Fitzgibbon twisted his wrist while yelling obscenities at him, causing Plaintiff unnecessary pain. (Doc. 1 at 10 ¶ 20; Doc. 83, 95 ¶ 55). Moreover, the video shows that Plaintiff's hands were in restraints behind his back, his legs were shackled to the chair, and five officers were present. (Doc. 83-4, Ex. 12, at 15:37:16).

Defendant argues that there was a need to restrain Plaintiff, and that Plaintiff only complains of a "split-second moment." (Doc. 82 at 13). However, Defendant does not present any argument as to why it was necessary to forcefully tighten only Plaintiff's left shoulder strap. Taking Plaintiff's version of events as true, Plaintiff posed no reasonable threat and there was no need for force because he was already restrained and surrounded by five officers. Moreover, a reasonable jury could find that Defendant Fitzgibbon's alleged comments demonstrate that his tightening of the shoulder strap was malicious and done with the intent to cause harm to Plaintiff.

Based on the evidence, a reasonable jury could find that Defendant Fitzgibbon used excessive force when he forcefully tightened Plaintiff's left shoulder strap after Plaintiff specifically complained of left shoulder pain. Therefore, the Court will deny summary judgment on the excessive force claim against Defendant Fitzgibbon regarding the tightening of the shoulder strap.

### 2. Punching

Plaintiff additionally stated in his verified complaint that Defendant Fitzgibbon and another officer escorted him to the medical unit and then to "an outside holding enclosure," where Defendant Fitzgibbon allegedly threw Plaintiff's "face to the ground striking him in the face" and yelling at him not to move. (Doc. 1 at 7, 11; *see* Doc. 83-3 at 11–12). Plaintiff claims that he was in restraints and could not defend himself from Defendant Fitzgibbon's punches. (*Id.* at 11). Plaintiff's statements in his verified complaint are based on Plaintiff's personal knowledge and therefore constitute direct evidence of a material fact. *See T.W. Elec. Serv., Inc.*, 809 F.2d at 631 ("If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true."). Defendants did not address these allegations in their Motion for Summary Judgment. (*See* Doc. 82).

Under Plaintiff's version of events, a reasonable jury could find that Defendant Fitzgibbon used force maliciously and with the intent to cause harm when he punched

1    Plaintiff for no reason while Plaintiff was restrained. Because there is a genuine dispute of
2    material fact as to whether these events occurred, the Court will deny summary judgment
3    as to the excessive force claim against Defendant Fitzgibbon regarding the alleged
4    punching incident.

5    **V.    QUALIFIED IMMUNITY**

6        Defendants assert that they are entitled to qualified immunity.[5] (Doc. 82 at 14).
7    Government officials enjoy qualified immunity from civil damages unless their conduct
8    violates "clearly established statutory or constitutional rights of which a reasonable person
9    would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if
10   qualified immunity applies, the Court must determine: (1) whether the facts alleged show
11   the defendant's conduct violated a constitutional right; and (2) whether that right was
12   clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–
13   32, 235–36 (2009) (courts may address either prong first depending on the circumstances
14   in the particular case). In the qualified immunity analysis, the court must consider all
15   disputed facts in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 660,
16   656–57 (2014); *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

17       The Court has already determined there are triable issues of fact on whether
18   Defendants Velasco, Otter, and Fitzgibbon violated Plaintiff's Eighth Amendment rights.
19   Qualified immunity thus turns on the second prong—whether the rights at issue were
20   clearly established such that these Defendants would have known their conduct was
21   unlawful. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

22       For a right to be clearly established, there does not need to be a case directly on
23   point, but "existing precedent must have placed the statutory or constitutional question
24   beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix v. Luna*, 577
25   U.S. 7, 12 (2017)). Clearly established law "must be particularized to the facts of the case"

---

26
27   [5] Defendants do not assert qualified immunity as to the excessive force claim against
28   Defendant Velasco involving the shots fired after Plaintiff was laying on the ground, or the
     excessive force claim against Defendant Fitzgibbon involving the punches while Plaintiff
     was restrained. Therefore, the Court does not address whether Defendants are entitled to
     qualified immunity as to those claims.

1    and "should not be defined at a high level of generality." *White*, 580 U.S. at 79 (quotation

2    and citation omitted). A right is clearly established when case law has been "earlier

3    developed in such a concrete and factually defined context to make it obvious to all

4    reasonable government actors, in the defendant's place, that what he is doing violates

5    federal law." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017)

6    (citing *White*, 580 U.S. at 78–79). "The Supreme Court has made clear that 'officials can

7    still be on notice that their conduct violates established law even in novel factual

8    circumstances.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting *Hope v.

9    Pelzer*, 536 U.S. 730, 741 (2002)). The question of whether a prison official's conduct was

10    reasonable in light of clearly established law is a "fact specific inquiry." *Castro v. County

11    of Los Angeles*, 797 F.3d 654, 688–69 (9th Cir. 2017). "[T]he defendant's subjective

12    understanding of the constitutionality of his or her conduct is irrelevant." *Clairmont v.

13    Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) (internal quotation marks and

14    omitted).

15    **A. Defendant Velasco**

16    Defendants argue that there is no caselaw clearly establishing "that using pepper

17    balls violated Plaintiff's Eighth Amendment rights" when "there was an active inmate-on-

18    inmate assault taking place and where Plaintiff was not obeying instructions." (Doc. 82 at

19    14). However, this argument improperly rests on Defendants' version of the facts.

20    "[W]here the [officer's] entitlement to qualified immunity depends on the resolution of

21    disputed issues of fact in [his] favor against the non-moving party, summary judgment is

22    not appropriate." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003). As noted

23    above, Plaintiff's facts and the video evidence suggest Plaintiff was not near the inmate-

24    on-inmate assault, the inmates involved in the assault were already on the ground and

25    complying when Plaintiff was shot, and it is unclear what orders, if any, were given to

26    Plaintiff. A reasonable officer in this situation would know that using force on an inmate

27    who presents no reasonable threat and is a mere bystander to a fight involving other inmates

28    would violate the prisoner's Eighth Amendment right. *See, e.g.*, *Marquez v. Gutierrez*, 322

F.3d 689, 692 (9th Cir. 2003) (concluding "shoot[ing] a passive, unarmed inmate standing near a fight between other inmates, none of whom was armed, when no inmate was in danger of great bodily harm, would inflict unnecessary and wanton pain" in violation of the Eighth Amendment).

The Ninth Circuit has held that "it is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain." *Furnace*, 705 F.3d at 1028 (cleaned up); *Xavier v. Tanori*, No. 19-CV-05587-JSW, 2022 WL 1240863, at *4 (N.D. Cal. Apr. 27, 2022) (citing *Vlasich v. Reynoso*, 117 Fed. App'x 568, 569 (9th Cir. 2004) (holding that after an initial failure to follow orders from prison officials, six bursts of pepper spray, when viewed in the light most favorable to the plaintiff, could support a reasonable inference of wanton infliction of pain in violation of the Eighth Amendment)). There is a genuine dispute of material fact as to whether Plaintiff posed a reasonable threat, and whether Defendant Velasco deployed more pepper balls than necessary. A reasonable officer in this situation would know that shooting a prisoner with pepper balls after the prisoner complies and in the absence of an ongoing threat would violate the prisoner's Eighth Amendment rights. Accordingly, Defendant Velasco is not entitled to qualified immunity.

In both cases cited by Defendants, the court decided the qualified immunity issue on the first prong, concluding that there was no evidence that the officers violated the Eighth Amendment. (Doc. 82 at 15); *see Clark v. Martinez*, No. 5:21-cv-00340-MCS-PD, 2023 WL 5435624, at *12 (C.D. Cal. June 9, 2023); *Manago v. Martinez*, No. 5:21-cv-01939-MCS-KES, 2023 WL 8604192, at *9 (C.D. Cal. Oct. 6, 2023). Here, the Court has concluded that there is a triable issue of fact as to whether Defendant Velasco violated Plaintiff's Eighth Amendment rights. Therefore, the cases cited by Defendants are inapposite.

**B. Defendant Otter**

Defendants argue that there is no caselaw clearly establishing "that striking an actively resisting inmate violated the inmate's Eighth Amendment rights." (Doc. 82 at 15). However, this argument improperly rests on Defendants' version of the facts. *See Wilkins*, 350 F.3d at 956. As noted above, Plaintiff's facts and the video evidence suggest Plaintiff was not actively resisting or threatening officers, had his hands cuffed behind his back, and was being escorted by two officers. A reasonable officer in this situation would know that body slamming Plaintiff with no provocation would violate the prisoner's Eighth Amendment rights. *See Wilkins*, 559 U.S. at 38 (noting that "[a]n inmate who is gratuitously beaten by guards" has the "ability to pursue an excessive force claim"); *Felix v. McCarthy*, 939 F.2d 699, 702 (9th Cir. 1991) (holding that "an unprovoked and unjustified attack by a prison guard . . . violated clearly established constitutional rights of which a reasonable officer would have known"). Accordingly, Defendant Otter is not entitled to qualified immunity.

**C. Defendant Fitzgibbon**

Defendants argue that there is no caselaw clearly establishing "that overtightening restraints for a split second violates the Eighth Amendment." (Doc. 82 at 15). However, "it is not the degree of injury which makes out a violation of the eighth amendment. Rather, it is the use of official force or authority that is 'intentional, unjustified, brutal and offensive to human dignity.'" *Felix*, 939 F.2d at 702 (quoting *Meredith v. Ariz.*, 523 F.2d 481, 484 (9th Cir. 1975)). Additionally, even if it only took a "split second" to overtighten Plaintiff's restraints, Plaintiff remained in those restraints for a longer period of time while he was being transported.

As noted above, Plaintiff's facts and the video evidence suggest Plaintiff was not actively resisting or threatening officers, had his hands cuffed behind his back and feet cuffed to the restraint chair, and was surrounded by five officers. Additionally, Plaintiff alleged that he told Defendant Fitzgibbon about his left shoulder pain. A reasonable officer in this situation would know that forcefully overtightening a prisoner's restraint in the exact

spot where the prisoner just complained of pain would violate the prisoner's Eighth Amendment rights. "[T]he Ninth Circuit and other circuit courts have long recognized that overly tight [restraints] may constitute excessive force, particularly where the [restraints] cause demonstrable injury or unnecessary pain, or when officers ignore or refuse requests to loosen the [restraints] once alerted that the cuffs are too tight." *Changamu v. Lamb*, No. No. CV-22-01598-PHX-DGC (JFM), 2025 WL 460912, at *13 (D. Ariz. Feb. 11, 2025) (compiling cases). Here, Plaintiff has a demonstrable shoulder injury and suffered unnecessary pain from the overtightening of the restraints, and while Plaintiff may not have requested for the restraints to be loosened, Defendant Fitzgibbon overtly ignored Plaintiff's complaints of pain in his left shoulder by specifically tightening Plaintiff's left should strap with force. Accordingly, Defendant Fitzgibbon is not entitled to qualified immunity.

## VI.    CONCLUSION

Based on the foregoing,

**IT IS ORDERED** withdrawing the reference to the Magistrate Judge on the pending motion for summary judgment (Doc. 82).

**IT IS FURTHER ORDERED** that the motion for summary judgment (Doc. 82) is granted to the limited extent specified in footnote 4 above and denied in all other respects.

**IT IS FURTHER ORDERED** referring this case to Magistrate Judge Alison S. Bachus (selected by random draw) for purposes of conducting a settlement conference. Within 14 days of this Order, the parties shall jointly contact Magistrate Judge Bachus' chambers (at 602-322-7610) to discuss a date and time for a settlement conference.

**IT IS FINALLY ORDERED** that if Plaintiff wishes to renew his motions for appointment of counsel (Docs. 51, 97) in light of the fact that this case will be going to trial, he may file a motion seeking appointment of counsel within 30 days.

Dated this 20th day of November, 2025.

James A. Teilborg
Senior United States District Judge